## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **LEANTHA ROSE CHAVEZ;** | § | |
| **JENNIFER RAE THOMSON, As** | § | |
| **Next Friend of N.C., a minor child,** | § | |
| **and as applicant to be dependent** | § | |
| **administratrix of the ESTATE OF** | § | |
| **NICOLAS CHAVEZ, DECEASED;** | § | |
| **LEIGHA ROSE-MARIE WISE, As** | § | |
| **Next Friend of A.N.W. and A.M.W.,** | § | |
| **minor children; JOAQUIN** | § | |
| **SALVADOR ANTONIO CHAVEZ,** | § | |
| **And JESSICA CHAVEZ,** | § | |
| *Plaintiffs*, | § | |
| | § | |
| **v.** | § | **C.A. No. 4:21-cv-867** |
| | § | **(Jury)** |
| **OFFICER LUIS ALVARADO,** | § | |
| **OFFICER BENJAMIN LEBLANC,** | § | |
| **OFFICER KEVIN NGUYEN,** | § | |
| **OFFICER OMAR TAPIA,** | § | |
| **OFFICER PATRICK RUBIO,** | § | |
| **HOUSTON POLICE DEPARTMENT,** | § | |
| **and the CITY OF HOUSTON,** | § | |
| *Defendants*. | § | |

## <u>PLAINTIFF'S SECOND AMENDED COMPLAINT</u>

TO THE HONORABLE U.S. DISTRICT CHIEF JUDGE:

COMES NOW, JENNIFER RAE THOMSON, as applicant to be the dependent administratrix of the ESTATE OF NICOLAS CHAVEZ, DECEASED, PLAINTIFF ("Plaintiff"), and files this PLAINTIFF'S SECOND AMENDED COMPLAINT, complaining of and against THE CITY OF HOUSTON,

DEFENDANT ("Defendant"), and for cause of action would respectfully show unto the Honorable Court and Jury the following:

## I.
## INTRODUCTION AND SUMMARY

1.      This Plaintiffs' Second Amended Complaint is filed based on leave granted by this Court in its July 22, 2021 Opinion and Order on Defendants' Motion to Dismiss under FED. R. CIV. P. 12(b)(6).  D.E. 27.   Historically, the City of Houston's Houston Police Department ("HPD") has been notorious for generally utilizing excessive force when confronting suspects, even of ordinary traffic stops. HPD has written policies and long-standing practices that the department, itself, shielded from public view until a light was shined on its unconstitutional practices, following a string of deadly confrontations with Houston citizens.  Since at least 2015, HPD has enforced an unwritten but formal policy through cadet training at the Houston Police Academy that treated Tasers as deadly weapons when in the hands of a suspect – regardless of whether the Taser was operational or not.  To be clear, HPD does not have a written policy authorizing Officers to shoot to kill any suspect that obtains a Taser during a confrontation with law enforcement.  Rather, the HPD policy authorizing the use of deadly force against suspects that obtain a live or spent (inoperable) Taser is specifically taught during Officer training at the Houston Police Academy.  In June 2020, following the shooting death of Plaintiff – shot 24 times by five different Officers while on his knees – then-Chief of Police Art Acevedo

("Chief Acevedo") changed HPD's unconstitutional policy to require officers to analyze whether a Taser was operational or not before using deadly force.  Clearly, Chief Acevedo understood that an unspent Taser posed no risk of serious bodily injury or death to an Officer in a confrontation.  Therefore, the new policy implemented after Mr. Nicolas Chavez was killed sought to require Officers who were in a confrontation with a suspect that grabs a Taser to move away from the suspect and determine if the Taser is operational or not before using deadly force. The existence of HPD's policy is exemplified by the fact that all five (5) Officers involved in shooting Mr. Nicolas Chavez believed they were justified based on their training and on policy.

2.      After an investigation, including a thorough review of bodycam video – later publicly released – and immense pressure from the public, HPD claimed that the Officers involved violated HPD's policies, and terminated them from employment at the department.  However, the City of Houston's claims that the Officers involved violated the policies of the department could not be further from the truth.  In fact, the President of the Houston Police Officer Union made public statements to the media after the Officers were fired that the Officers acted properly and should be given their jobs back because they "did what they were trained to." This Complaint is brought, in part, to shine a light on the very policies and procedures implemented at HPD that resulted in harsh and cruel and unnecessarily

excessive force that proximately caused the death of Mr. Nicolas Chavez.  Moreover,

this Complaint seeks substantial remuneration for the family of Mr. Nicolas Chavez,

intended to recover pecuniary remuneration for their grave loss and, also, to punish

and deter HPD from continuing its lawless policies and practices that encourage

unconstitutional punishment instead of the de-escalation of disturbances.   As

grounds for this action, the Plaintiffs show the following:

## II.
## PARTIES AND OTHER INTERESTED PERSONS

3.      PLAINTIFF, JENNIFER RAE THOMSON, as applicant[1] to be

dependent administratrix of the ESTATE OF NICOLAS CHAVEZ, DECEASED,

is an individual who resides in Harris County, Texas.

4.      DEFENDANT, THE CITY OF HOUSTON, is a governmental unit in

the State of Texas.  It has appeared herein and may be served through its counsel of

record.

5.      OFFICER LUIS ALVARADO is a Houston Police Department Officer

who shot and killed Nicolas Chavez.

6.      SERGEANT BENJAMIN LEBLANC is a Houston Police Department

Sergeant who shot and killed Nicolas Chavez.

---

[1] The heirship proceeding has not yet concluded.  Plaintiff will dutifully supplement to the Court
all pertinent letters of administration within fourteen (14) days of their issuance, pursuant to the
Court's Order.  D.E. 27, at pp. 1, 12, 27.

7.     OFFICER KEVIN NGUYEN is a Houston Police Department Officer who shot and killed Nicolas Chavez.

8.     OFFICER PATRICK RUBIO is a Houston Police Department Officer who shot and killed Nicolas Chavez.

9.     OFFICER OMAR TAPIA is a Houston Police Department Officer who shot and killed Nicolas Chavez.

### III.
### JURISDICTION AND VENUE

10.     This Court has jurisdiction over this lawsuit.  28 U.S.C. § 1331.  The claim involves a question of federal law under the Enforcement Act of 1871.  *Id*.; *see also*, 42 U.S.C. § 1983.

11.     Venue is proper in the United States District Court for the Southern District of Texas, Houston Division, because all or a substantial part of the events that gave rise to this cause of action occurred in the United States District Court for the Southern District of Texas, Houston Division.  28 U.S.C. § 1391(a)(2).

(next page)

## IV.
## FACTS



12.     Decedent Nicolas Chavez ("Nicolas") was born on August 25, 1992 and died on April 21, 2020.  He was born to Joaquin Salvador Antonio Chavez and Leantha Rose Chavez, his loving parents (father and mother, respectively).  He died alone in a ditch after being shot to death by Officer Luis Alvarado ("Officer Alvarado"), Sergeant Benjamin LeBlanc ("Sergeant LeBlanc"), Officer Kevin Nguyen ("Officer Nguyen"), Officer Patrick Rubio ("Officer Rubio"), and Officer Omar Tapia ("Officer Tapia"), Officers of the Houston Police Department and pursuant to the direction and explicit policies of the City of Houston.

13.     Nicolas loved his family.  He loved more than anything in the world his three little children: his daughters A.M.W. and A.N.W., and his son N.C.  He also loved his wife, Jessica Chavez, the love of his life, whom he married in 2019. The two looked forward to a life together.



14.     But Nicolas was not perfect.  After all, nobody is.  Nicolas suffered complications of mental illness.  This was not his choice.

15.     This was well-known in the community.  Nicolas was brave.  Nicolas sought, and received, treatment.

16.     He was a patient at The Harris Center for Mental Health and IDD [Intellectual or Developmental Disability] (formerly known as the Mental Health

and Mental Retardation Administration ["MHMRA"]).  Nicolas worked diligently to overcome these challenges.

17.     Unfortunately, the work against mental illness never ends. Nicolas fought valiantly against it, and the urges to hurt or kill himself.  Unfortunately, one night, the urges proved too strong.  Nicolas sought, perhaps, to kill himself.  But he did not.  He decided he wanted to live.  It was those sent to ostensibly to protect him, and protect the community, who decided to gratuitously and cruelly end his life that day.

18.     On April 21, 2020, Nicolas was in Houston.

19.     Just before 9:00 PM that day, Nicolas was "in an apparent mental crisis," according to former Houston Police Department Chief Art Acevedo ("Chief Acevedo").

20.     Nicolas was allegedly in close proximity or near to the freeway, specifically Interstate-10 by the Lockwood exit.

21.     Out of concern to *his* safety, at least three callers at this time placed calls in to 9-1-1 to report Nicolas's danger to himself.

22.     None of them reported him as aggressive.

23.     And none of them reported him as violent.

24.     Rather, the callers sought to bring attention to Nicolas having a mental health crisis.

25.    "[T]here's a guy trying to jump in front of cars," one caller said.

26.    "[H]e's throwing himself in front of cars," the caller continued.

27.    "Looks like he was having a mental breakdown," the caller continued still.

28.    At some point afterwards, Nicolas left the freeway.  Perhaps he realized he did not want to kill himself that night.  His intentions are unknown now, because of what happened.

29.    Nicolas started walking through yards.

30.    He was very upset.  He still, sadly, sought to self-harm.

31.    At some point, Nicolas sought to self-harm with a piece of pipe or rebar.

32.    A caller to 9-1-1 hypothesized Nicolas may have broken a water pipe.

33.    But the caller, in any case, observed he was bleeding while holding what appeared to a piece of pipe, or piece of metal.

34.    Chief Acevedo noted that Officers then responded.   Nicolas was, even in Chief Acevedo's words, "apparently suicidal."  He was also "distraught[.]"

35.    Chief Acevedo says that the Officers "tried talking to him."

36.    This consisted of Officer Tapia exclaiming "calm down, man, calm down."

37.     This interjection, obviously, was of little effectiveness to a mentally ill man being approached by a small army of heavily armed law enforcement in the night.

38.     Nicolas, at this time, was in the fetal position.

39.     He was crouching behind a telephone pole, in a small space with a parking lot wheel block on one side and a wooden fence on the other.

40.     A clinch of metal sound permeated the air.

41.     It is apparent that Nicolas attempted to stab himself then with what was later revealed to be a piece of rebar.

42.     Officer Tapia exclaimed "he's holding onto something."

43.     But at this point, Nicolas, *having stabbed himself*, collapses to the ground, behind the wooden telephone pole.

44.     He drew silent.



45.    The video from Officer Tapia cut immediately after Nicolas had stabbed himself, screamed, and then inelegantly collapsed to the dirt.

46.    Nobody saw the aftermath.

47.    Sergeant LeBlanc then drew his taser.

48.    He did this, apparently, after Nicolas stabbed himself and lied on the dirt.

49.    Sergeant LeBlanc was the commanding officer.

50.    Sergeant LeBlanc did this pursuant to his practice, experience, and training.

51.    No other officers thought it amiss that Sergeant LeBlanc drew his taser so quickly, as this was done *under color of law*.

52.    "Hey, somebody get your taser out," Sergeant LeBlanc exclaimed.

53.    "Get your taser out," he exclaimed.

54.    One of the fellow responding officers, responding to a directive by his commanding officer, quickly exclaimed in the affirmative, "I got it, sarge."

55.    Nicolas then screamed an expletive at the officers who had surrounded him in the night with drawn weapons.

56.    Nicolas admonished the officers to shoot him.

57.    They sadly did that night.

58. At that moment, though, Sergeant LeBlanc reflexively pointed his taser directly as Nicolas.

59. Then, with the weapon drawn, said, "hey bud, hey bud, we're here to help you, man."

60. Regrettably for Nicolas and his family, they were not.

61. By then, Nicolas had emerged from behind the wooden telephone pole.

62. He remained on his two feet immediately in front of the parking lot wheel block.

63. Nicolas was afraid.

64. He talked back to the officers, and exclaimed they would not be there to help him.

65. Nicolas began pacing about in the perhaps four-foot area between the parking lot wheel block and the wooden fence.

66. Officer Tapia, only at this time, even asked Nicolas his name, albeit after he demanded Nicolas drop to the ground.

67. But Nicolas appeared to be stabbing himself again.

68. A woman, apparently a witness, attempted to plead with Nicolas.

69. "It's going to be alright, sir," she said.

70. She was regrettably wrong.

71. Nicolas exclaimed, "no it's not!"

72.     And sadly, he was right.

73.     "***I'm a MHMRA patient and I feel like dying!***"  Nicolas screamed this.

74.     In one sentence, Nicolas bravely and succinctly telegraphed the seriousness and solemnity of the occasion.  At once, he told the officers assembled of his suicide ideation.  He did this despite the Houston Police Department, like many police departments, having a renowned reputation for shooting and killing mentally ill people experiencing mental illness episodes.  Nicolas reported his issue, and reported his experience in the system.

75.     Nicolas was or had been a patient at the institution formerly named MHMRA, and quickly informed the officers.



76.     After a few moments more, Nicolas exclaimed again to officers, "shoot!"

77.     Again, Nicolas knew what was going to happen, because it had happened so many times before as to become nearly a foregone conclusion: The police would shoot and kill he whom they should—and had sworn to—serve and protect.

78.     "No one's shooting," Officer Tapia responded, and asked Nicolas again to "calm down."

79.     Nicolas then began to walk about the parking lot.

80.     Nicolas made no furtive movements.

81.     Nicolas took no aggressive actions.

82.     He merely walked about the parking lot, screamed and contorted, well away from anyone else, suffered through a severe, acute episode of mental illness.

83.     The officers, however, implored Nicolas *to approach them*!

84.     For even though this exact action would cost Nicolas his life and lead to him being shot dozens of times, the officers said, "Just do us a favor. *Come here*."

85.     Upon this command, Nicolas screamed.

86.     He waved about his arms, and made loud noises.

87.     At no point did Nicolas act aggressively toward anyone.

88.     At no point did Nicolas act surreptitiously or suspiciously.

89.    He simply suffered mental illness.

90.    Waving around so quickly, Nicolas nearly lost his balance.

91.    But the officers remained in pursuit of him.

92.    Officer Alvarado followed closely.

93.    He had his taser drawn, and pointed at Nicolas, who attempted to squirm and scream his way away, without threatening anyone.

94.    Nicolas complied.

95.    At this time, he placed his hands behind his back.

96.    He demonstrated clearly and unequivocally that, notwithstanding his mental crisis, and notwithstanding his suicide ideation, he meant no harm to the officers or to anyone else.



97.   Officer Alvarado then shined his light directly upon Nicolas.

98.   He still pointed his taser at Nicolas.

99.   At that point, Nicolas dropped that which he had been carrying: A very small piece of rebar.

100.   The sound of the metal dropping and clanking against the concrete was conspicuous.

101.   He had no weapon.

102.   He had absolutely nothing.

103.   The officers quickly approached Nicolas.

104.   He turned around.

105.   He faced them with nothing.

106.   With his arms spread apart, the officers shot  him with nonlethal weaponry, *i.e.*, the bean bags.


(next page)



107.    Repeatedly, Nicolas was struck by these bean bags.

108.    The impact was fierce.  Nicolas was injured.

109.    But Nicolas had suicide ideation.  Hurting him was not a deterrent.  He wanted to hurt himself, and now the officers openly colluded and collaborated in his regrettable aspiration to self-harm.

110.    Nicolas refused to get on the ground.

111.    But Nicolas quite conspicuously never threatened the officers.

112.    He never engaged in any furtive movements.

113.    He never engaged in any aggressive or threatening movements.

114.    He merely screamed.

115.    Nicolas affirmed, "yeah," after being shot.

116.   He did this because he wanted to be hurt, and the officers who had hurt him had responded affirmatively to his tragic request.

117.   Nicolas then exclaimed, "another one," again attempting to goad the officers into hurting him because he was suffering from suicide ideation.

118.   Sadly, the officers did just this.

119.   Sergeant LeBlanc went, "y'all, taser him."

120.   He did this as the commanding officer of the group.

121.   The rest of the officers saw nothing wrong with their commanding officer prompting them to shoot electrical current into a helpless man in the middle of a mental health crisis trying to self-harm.

122.   This was because it was done pursuant to very widespread patterns or practices of the Houston Police Department.

123.   These practices were so widespread as to have the force of the law.

124.   So the officers shot Nicolas with a taser.

125.   They do this under color of law.

126.   Nicolas, still, paced around.

127.   He still did this without any furtive or aggressive movements.

128.   One officer exclaimed, **falsely**, Nicolas had a knife.  He did not.

129.   Officer Tapia realized that Nicolas intended *self-harm*, and not aggression toward others, with the rebar.

130.   He shouted at Nicolas, "stop cutting yourself, man."

131.   Officer Tapia was cognizant the rebar was not meant as a weapon.

132.   He knew it was only for self-harm and for Nicolas's tragic suicide ideations.

133.   It was at this point, stumbling through the parking lot, Nicolas approached the ditch.

134.   He again yelled at the officers, "shoot."

135.   Only now, Nicolas began to approach the officers.

136.   He was repeatedly struck with nonlethal weapons.

137.   He had his arms out.

138.   He was not threatening anyone.

139.   He was not acting aggressive or furtive toward others; rather, he was simply walking.

140.   By this time, a Deputy Garduño of the Harris County Precinct 6 Constable's Office had come to assist.

141.   Nicolas very slowly approached Deputy Garduño.

142.   The Deputy fired a nonlethal taser at Nicolas.

143.   This, and only this, nonlethal force from the Deputy may have been justified.

144.    But in direct response to Nicolas coming near, Deputy Garduño fired a nonlethal taser.

145.    Deputy Garduño, in the best situation to gauge risk posed, chose to use nonlethal force.

146.    This is why Deputy Garduño is not a Defendant here.

147.    Deputy Garduño is a deputy of a Harris County Constable's Office.

148.    There is no evidence that the Constable's Office had policies and procedures and training to maim or kill people like Nicolas.

149.    Only the Houston Police Department did.  This is why it is Houston Police who tortured and killed Nicolas, and not anyone from Harris County's Constables' or Sheriff's offices.

150.    Yet Sergeant LeBlanc went out of his way to come into the situation.

151.    He ran toward Nicolas.

152.    He ran ahead of other officers.

153.    And when Nicolas very slowly approached Deputy Garduño, it was Sergeant LeBlanc who drew his service weapon and fired twice at Nicolas.

154.    Sergeant LeBlanc fired at Nicolas with *lethal force* despite not being in fear of harm.

155.    Sergeant LeBlanc, perhaps, alleged he feared for Deputy Garduño, and yet Deputy Garduño, in that situation, opted to use *nonlethal force*.

156.   The juxtaposition could not be starker, nor more evident of the opposed patterns, practices, and trainings.

157.   Simply put, it was only Sergeant LeBlanc who could take such action wantonly indifferent and contumacious of Nicolas's civil rights under color of his governing law.

158.   Deputy Garduño could not, and did not.

159.   Sergeant LeBlanc did.

160.   Other officers at this time deployed tasers. One was an Officer Nancy Leija ("Officer Leija").

161.   Officer Leija deployed her taser at this time.

162.   A subsequent internal investigation by the Houston Police Department clearly "establishe[d] that the [taser] was fully deployed by Officer Leija[.]"

163.   She very clearly placed the taser on the ground with intent, because it had been fully spent and would pose no further risk to anyone.


(next page)



164.   Nicolas wallowed in pain and agony.

165.   While the body cameras were blacked out, a woman's voice—assumedly one of the deputies who had responded—exclaimed "sergeant, stay on the ground!"

166.   The sergeant was presumably Sergeant LeBlanc.

167.   The deputy was presumably upset that Sergeant LeBlanc was so eager to initiate conflicts, as opposed to the deputies assembled who were earnestly attempting to deescalate the situation.

168.   Nicolas, in excruciating pain, having been shot down into the ground, exclaimed, "*[expletive] you, kill me*."



169.   Nicolas continued to welter, writhing steeped in his own blood without help or assistance.

170.   Officer Tapia commanded him to drop a knife.

171.   But Nicolas had no knife.

172.   He had the small piece of rebar, one that even Chief Acevedo noted he was using just to harm himself.

173.   Upon these commands, Nicolas again pleaded with the officers to kill him, as he had been doing since the beginning of the encounter.

174.   Nicolas would eventually get rid of the object Officer Tapia erroneously believed to be a knife.

175.   ***Almost immediately after Nicolas did that, Officer Tapia—as well as other officers—shot and killed Nicolas!***



176. Hearing no response to his imploration of suicide, Nicolas began to stab himself once more.

177. "Stop doing that," Officer Tapia again said, again with a loaded weapon pointed directly at Nicolas.

178. Thirty-seven (37) seconds elapsed.

179. "Hey, we're here to help you, bud," Officer Tapia said.

180. "No you're not," Nicolas responded.

181. "Just put me away," he again implored as to his suicide ideation.

182. Officer Tapia asked Nicolas to comply.

183. Nicolas once again asked him to kill him.

184. Nicolas, who had been lying face down in a ditch, now rolls around.

185. He rolled around to be on his knees, and not his back.

186.   Two minutes and forty-six (46) seconds elapsed.

187.   Officer Tapia was still commanding Nicolas not to rise.

188.   Nicolas exclaimed in response, "***what the [expletive] you scared of? Can't kill a Mexican-Chinese?***"

189.   Another two minutes and forty-eight (48) seconds elapsed.

190.   Throughout all this time, Nicolas was incapacitated in a ditch.

191.   Nicolas continued to self-harm in the ditch.

192.   He continued to stab himself with the piece of rebar.

193.   And the officers continued pointing the weapons at him and threatening him, should he move.

194.   "***[Expletive] you. I'm going to die tonight***," Nicolas said after already being shot twice and having been the victim of taser-induced electrocution and pelleting by nonlethal weaponry myriad times.

(next page)



195.   Throughout all of this time, Nicolas was either on his knees, on his stomach, or on his back.

196.   Twenty-five (25) more seconds elapsed.

197.   Nicolas then quickly arose out of the ditch.

198.   He began walking, with his arms outstretched to show he was unarmed, out of the ditch.


(next page)



199.   Officer Nguyen at this point fired his service weapon at Nicolas. Officer Nguyen shot Nicolas.

200.   This despite Nicolas being unarmed and posing no risk of reasonably deadly harm.

201.   Nicolas was now on his knees on the parking lot.

202.   Myriad officers had surrounded him.

203.   Nicolas took the piece of rebar he had long been holding.

204.   And he quickly threw it far away.

205.   The rebar clanked against the concrete.

206.   It made an unmistakable sound.  The sound of metal hitting concrete is distinct, and it could be clearly and unequivocally heard.



207.   Nicolas then began to pull on the taser electrical wires protruding into him, which had been used to electrocute him.

208.   He then slowly began to pull the spent and used taser cartridge that Officer Leija had used and set on the ground.

209.   Nicolas picked up the taser.

210.   He remains seated on the floor.

211.   He made no gestures.

212.   He made no moves.

213.   He did not try to rise to his feet.

214.   He did not point the spent taser in his hand.

215.   He merely held it.

216.    Officer Alvarado, Sergeant LeBlanc, Officer Rubio, and Officer Tapia then shot Nicolas Chavez twenty-one (21) times.

217.    Nicolas died, alone and scared in that ditch.

218.    Sergeant LeBlanc specifically fired two of the final twenty-one (21) rounds of live ammunition at and into Nicolas.

219.    Officer Alvarado specifically fired seven of the final twenty-one (21) rounds of live ammunition at and into Nicolas.

220.    Officer Rubio specifically fired six of the final twenty-one (21) rounds of live ammunition at and into Nicolas.

221.    Officer Tapia specifically fired six of the final twenty-one (21) rounds of live ammunition at and into Nicolas.

222.    The Defendants acted under color of law.  They admit this.

223.    And the City of Houston, by and through several of its officers, but also through its express customs, patters, and practices, killed Nicolas.

224.    Nicolas was born to a happy mother and a joyous father.  He delighted three children.  He loved and was loved by his wife.  They are no without a child, without a father, and widowed, respectively.

225.    Had Nicolas still been alive today, he would have turned 29 on August 25, 2021, in a dozen days.

226.    His children would have their father. His parents would have their son.



227.   His wife would have her husband.

### *The City of Houston's unconstitutional policy*

228.   For many years, and in any case no later than 2015, the City of Houston had a formal policy authorizing lethal force against those suspects that have Tasers, regardless of whether the Taser was live or inoperable.

229.   Most Tasers utilized by the City of Houston when the policy was taught at the police academy had one (1) cartridge.

230.   Later, some Tasers had two (2) cartridges, allowing for two separate firings of Taser darts.

231.   Although it is plainly obvious to determine whether a Taser (designed to be non-lethal) has been fully fired (spent) or if it is live, the City's policy made no distinction between live or spent when authorizing the use of deadly force.

232.   Most, if not all, experts of Taser use agree that a spent/inoperable Taser poses little, if any, risk to Officers in a confrontation.

233.   This formal policy was an oral training guidance promulgated by policymakers up to and including Chief Acevedo.

234.   This formal, oral policy was taught in conjunction with General Order 600-17 ("GO 600-17") of the Houston Police Department.

235.   GO 600-17 allowed the use of deadly force to prevent "serious bodily injury or death."

236.   Dr. James R. Brooks ("Dr. Brooks") is a retired Houston Police Department Sergeant.

237.   Dr. Brooks honorably served the Houston Police Department for 27 years.

238.   Dr. Brooks supervised classified and civilian personnel at the Houston Police Academy.

239.   Dr. Brooks managed a substantial training budget.

240.   Dr. Brooks reviewed and developed lesson plans for the Houston Police Department's training curriculum.

241.   Dr. Brooks developed defensive tactics lesson plans.

242.   Dr. Brooks was the defensive tactics supervising instructor.

243.   Dr. Brooks averred, "[t]he Houston Police Department, through its training, had a policy whereby Tasers in the hands of officers were considered less-lethal weapons[.]"

244.   The Houston Police Department, through its training, had a policy whereby Tasers in the hands of officers were considered less-lethal weapons.

245.   Dr. Brooks averred that Tasers "in the hands of suspects were considered deadly weapons if used or exhibited as an imminent threat for serious bodily injury or death."

246.   The Houston Police Department, through its training, had a policy whereby Tasers in the hands of suspects were considered deadly weapons if used or exhibited as an imminent threat for serious bodily injury or death.

247.   Dr. Brooks averred, "Officers were thereby authorized to use deadly force in such circumstances."

248.   The Houston Police Department, through its training, had a policy whereby Officers were authorized to use deadly force against suspects holding Tasers.

249.   Dr. Brooks averred, "[t]his training and policy did not specifically differentiate between spent (used) and live (unused) Tasers."

250.   The Houston Police Department, through its training, had a policy whereby Officers' use of deadly force against suspects holding Tasers did not specifically differentiate between spent (used) and live (unused) Tasers.

251.   Dr. Brooks averred he "ha[d] personal knowledge of this training and policy as [he] taught and trained it to cadets and officers."

252.   All the foregoing, in ¶ 243-51, were official policies of the City of Houston, promulgated by policymakers up to and including Chief Art Acevedo.

253.   **The City of Houston had a policy for its Officers to use deadly force on any suspect who picks up a Taser, without differentiating between spent (used) and live (unused) Tasers.**

254.   But for this policy, Nicolas would still be alive.

255.   Precisely and proximately because of this policy, Nicolas is dead.

256.   Officer Alvarado acted in accordance with the policy.

257.   Sergeant LeBlanc acted in accordance with this policy.

258.   Officer Rubio acted in accordance with this policy.

259.   Officer Tapia acted in accordance with this policy.

### *The City of Houston's cover-up*

260.   The City of Houston, however, was not forthcoming about this policy.

261.   Upon information and belief, the City of Houston's policymakers, including Chief Acevedo, sought to cover-up this policy.

262.   Upon information and belief, Chief Acevedo went to the Houston Police Academy and told trainers to not talk about this policy.

263.   Upon information and belief, Chief Acevedo threatened trainers at the Houston Police Academy who would not comply with such edicts.

264.   Nicolas's death was not immediately reported.

265.   A "Good Samaritan" witness took a video of the end of the incident, including Nicolas's shooting and death, on a cell phone.

266.   This cell phone video was 47 seconds long.

267.   This cell phone video was uploaded to YouTube.

268.   This cell phone video was uploaded on or about April 22, 2020, which was one day after Nicolas's death.

269.   This cell phone video is still accessible at <https://www.youtube.com/watch?v=HalnE5mZIJ8>.

270.   The video quickly was shared wide and far across Houston and the country.

271.   Eight days after the shooting, on April 29, 2020, Chief Acevedo held his first press conference about Nicolas and his death.



272.   Chief Acevedo pledged at this date to release full video of the encounter.

273.   But upon information and belief, at this time, Chief Acevedo was already engaged in a cover-up.

274.   Shortly thereafter, Houston Police Officer Union president Joe Gamaldi ("Gamaldi") released a statement.

 **HOUSTON POLICE OFFICERS' UNION** 
*FRATERNAL ORDER OF POLICE LODGE 110*
1600 STATE STREET – HOUSTON, TEXAS 77007 – 832.200.3410

### Forty-Five Second Video Does Not Tell the **15 Minute** Story

It has been brought to our attention that there is a short, citizen's video being shared on social media portraying a portion of an officer involved shooting on the northeast side of Houston 2 weeks ago. This call started as a suspicious person with a weapon, who was threatening citizens, and attempting to be hit by passing cars. The short clip that is being circulated does not give the proper context or vantage point, for individuals to make a balanced assessment of our officers' use of force. Very similar to those who are attempting to commit suicide. We are confident the body camera video will show the entire incident and we are asking for it to be released.

The incident portrayed in the short video actually lasted **15 minutes**, and when the body camera footage is released, you will see Mr. Chavez's actions are a clear example of "suicide by cop". Obviously, it is very unfortunate that the individual backed these officers into a corner, but it is clear from the totality of the circumstances that our officers followed their training and gave this individual every opportunity to comply peacefully and safely. During the **15 minutes** the officers were dealing with Mr. Chavez they gave him dozens of verbal commands, they attempted to de-escalate, they retreated away from him to give him space, but he kept coming after them with a piece of sharp rebar, which he had already used to cut himself several times.

When Mr. Chavez closed distance on them they tried using a bean bag shotgun, it had no effect. They tried using a taser, it had no effect. They continually used verbal commands pleading/ordering him to stop, following Houston Police Department training to a "T", to no avail. When Mr. Chavez finally got close enough, despite our officers' best efforts to give him space, he then attempted to stab one of our officers and the officer fired. Even after that initial shooting, the officers continue to keep distance and give verbal commands to Mr. Chavez, but he still refused to comply. None of this is captured on the citizen's video.

Mr. Chavez then throws the piece of rebar at the officers and picks up the wires from a taser on the ground. He begins pulling the wires toward him, along with the taser itself. The officers continue to give verbal commands for him to stop, following their training, but he refuses. Mr. Chavez then picks the taser up and points it at our officer. At that point the shooting takes place and that is what you see on the circulated video. It is clear when looking at the totality of the circumstances of the entire **15 minute** interaction that these officers showed tremendous restraint. They followed the law, they followed their training, and did exactly what is expected of them as Houston Police Officers. Sadly, it was clear that Mr. Chavez's goal that night was for our officers to shoot him. They did everything they could to try to avoid that, but ultimately Mr. Chavez's determination to back them into a corner and threaten them with serious bodily injury/death (twice) forced them to take necessary action. His mother would later report he was having emotional issues following his release from prison.

I want to remind every member of our community that none of our officers ever want to be involved in a shooting and particularly a "suicide by cop". Their actions that night were in response to Mr. Chavez and his unwillingness to comply with any of their lawful commands. As this investigation plays out, it will be clear that our officers not only acted lawfully, but acted within department policy, and did exactly as their training dictates. Again, in the spirit of transparency, and to keep any false narratives from developing, we ask the Houston Police Department to release the video in its entirety.

Joe Gamaldi
HPOU FOP Lodge 110 President

275.   Gamaldi wrote that the Officers "acted within department policy[.]"

276.   Gamaldi wrote that the Officers "did exactly as their training dictates."

277.   Gamaldi was right.

278.   Chief Acevedo was wrong.

279.   Nicolas's shooting and death preceded a rash of HPD shootings in the weeks thereafter.

280.   Four such events occurred in quick succession.

281.   Police brutality, indeed, is ubiquitous nationwide.

282.   And nationwide, the issue went to the forefront of the news shortly thereafter.



283.   On May 25, 2020, Derek Chauvin kneeled on George Floyd's neck. George Floyd died.   The Black Lives Matter movement prompted nationwide, indeed worldwide, protests.   (Chauvin was later indicted for the murder of Floyd. He was convicted of the same in 2021.)

284.   Such protests came to Houston.

285.   There were several days of protests in downtown Houston, commemorated Floyd—a native Houstonian—in particular and police violence victims in general.

286.   Chief Acevedo appeared at these rallies.



287.   But all the while Chief Acevedo talked, he did not proverbially walk the walk.  Chief Acevedo continued covering up this policy.

288.   Interviews soon took place at the Internal Affairs Division ("IAD").

289.   IAD interviewed Officer Tapia on June 17, 2020.

290.   Officer Tapia said he shot and killed Nicolas pursuant to how he was trained and further pursuant to policy.

291.   Specifically, Officer Alvarado acted pursuant and in accordance with the City of Houston's policy to shoot to kill suspects who picked up Tasers, without specifically differentiating whether or not they were spent (used) or live (unused).

292.    This is the exact policy to which Dr. Brooks averred.

293.    IAD interviewed Officer Alvarado on June 18, 2020.

294.    Officer Alvarado said he shot and killed Nicolas pursuant to how he was trained and further pursuant to policy.

295.    Officer Alvarado said he was taught by the Houston Police Academy that taking a Taser prompted deadly force.

296.    Officer Alvarado told IAD that all of his experience was based on [t]raining at the academy[.]"

297.    Specifically, Officer Alvarado acted pursuant and in accordance with the City of Houston's policy to shoot to kill suspects who picked up Tasers, without specifically differentiating whether or not they were spent (used) or live (unused).

298.    This is the exact policy to which Dr. Brooks averred.

299.    IAD interviewed Officer Rubio on June 18, 2020.

300.    Officer Rubio said he shot and killed Nicolas pursuant to how he was trained and further pursuant to policy.

301.    Officer Rubio told IAD, "[s]o, um, just like when we're all trained in the academy on the, uh, [T]aser and we're – we're taught, you know, the effects of it and how to train properly with to where we cannot cause serious bodily injury to someone or to physical harm – hurt them or cause death to them."

302.   Officer Rubio continued to IAD, "[b]ecause we're trained with the weapon[,] meaning the Taser.

303.   Officer Rubio continued to IAD, "[u]m, but you're taught, hey this – this [T]aser – if u… -- used by a suspect can cause death or serious bodily injury meaning the [T]aser can either hit you in the eye like I was mentioning before, cause you to go blind in that eye, hit you in both your eyes."

304.   Officer Rubio continued to IAD that an intermediate weapon such as a Taser, "[i]f taken by a suspect or someone that's not trained on them, they can be used as a deadly weapon."

305.   **Officer Rubio continued to IAD, "[l]ike, your flashlight, _YOU CAN BLUDGEON SOMEONE WITH IT_**."  (Emphasis added.)

306.   A Taser would only form an inherent risk from bludgeoning if fully spent.

307.   Officer Rubio recognized and followed the City of Houston's policy to not differentiate between spent (used) and live (unused) Tasers.

308.   Officer Rubio recognized and followed the City of Houston's policy that all incidents wherein suspects picked up Tasers prompted deadly force.

309.   Officer Rubio continued to IAD, "we're taught if it's taken it results back to, like I was sayin[g], us…—use of force continuum, you – then it's deadly force due to how it can be used against you as a deadly weapon."

310.   This is the same training and policy to which Dr. Brooks averred.

311.   IAD interviewed Sergeant LeBlanc on June 19, 2020.

312.   Sergeant LeBlanc said he shot and killed Nicolas pursuant to how he was trained.

313.   Sergeant LeBlanc told IAD, "[w]henever I was trained at the Academy by the officer safety unit and by the defense tactics people[,] they trained us that [T]asers can be deadly weapons[,] especially in the hands of people that aren't trained on how to use them."

314.   This is the same training to which Dr. Brooks averred.

315.   Sergeant LeBlanc continued to IAD, "I remember defensive tactics."

316.   This was Dr. Brooks's training.

317.   Sergeant LeBlanc continued to IAD, "[a] defensive tactics instructor told me if somebody gets your [T]aser from you and they are going to use it against you[, then] you are allowed to use deadly force…"

318.   The defensive tactics instruction was Dr. Brooks's training.

319.   Sergeant LeBlanc continued to IAD that this training did not differentiate as to how many Officers were on the scene.

320.   Sergeant LeBlanc told IAD, "[t]hey [(the defensive tactics instructor)] didn't touch on how many officers had to be there or should or shouldn't be there for you to use deadly force."

321.   Sergeant LeBlanc continued to IAD, "[t]hat was never part of that instruction[,] but that's – that's the training that comes in – into play there. You know."

322.   Sergeant LeBlanc confirmed Dr. Brooks's averment.

323.   Specifically, Sergeant LeBlanc acted pursuant and in accordance with the City of Houston's policy to shoot to kill suspects who picked up Tasers, without specifically differentiating whether or not they were spent (used) or live (unused).

324.   This is the exact policy to which Dr. Brooks averred.

### The cover-up is complete

325.   On June 29, 2020, the City of Houston amended its Taser policy.

326.   What had been an unwritten, but formal policy, on that date became a written policy.

327.   The updated policy read, in operative part, "[i]f a suspect gets an officer's C.E.D [(Taser)] or when an officer encounters a suspect armed with a C.E.D, *the officer disengage and create distance, if possible beyond 21 feet, and seek cover and concealment.*" (Emphasis added.)

328.   The updated policy continued, "[t]he officer should then draw his/her primary weapon to prevent from becoming incapacitated by the C.E.D., reassess, and request additional resources."

329.   This was a marked shift from the policy on April 21, 2020.

330.   This was a marked shift from that the Officers were trained to do.

331.   This new policy would have saved Nicolas's life.

332.   But the old policy – unconstitutional because of its overbreadth – ended it.

### *Officers indefinitely suspended*

333.   On September 10, 2020, nearly five months after Nicolas's shooting and death, Chief Acevedo released the body camera footage.

334.   The footage showed the excruciating events of April 21, 2020.

335.   Chief Acevedo also indefinitely suspended Officer Alvarado, Sergeant LeBlanc, Officer Rubio, and Officer Tapia.



336.    Flanked by Mayor Sylvester Turner, Chief Acevedo accused the Officers of violating their policy.

337.    In reality, they acted in accordance with it.

338.    **To be clear, this does not absolve the Officers.  It is not a defense to be *only following orders*, when those orders and policies are patently wrong and unconstitutional**.

339.    The Officers bear full culpability for abiding by an unconstitutional policy.

340.    But the City bears legal liability and culpability for promulgating and teaching the policy in the first place.

341.    Chief Acevedo said the Officers acted unreasonably.

342.    Chief Acevedo said no policy change was necessary.

343.    It was "a matter of judgment," he said.

344.    This was untrue.

345.    In fact, Chief Acevedo had ratified an explicit policy change dealing with suspects and Tasers on June 29, 2020, after Nicolas's death but a couple months before this press conference.

346.    Douglas Griffith, the First Vice President of the HPOU, said, "[t]he officers acted in the manner in which they were trained and by policy."

347.   Griffith specifically referred to the policy whereby Officers were trained to shoot to kill any suspect who picked up a Taser, without specifically differentiating as to whether or not the Taser was spent (used) or live (unused).

348.   Gamaldi said Officers were "follow[ing] policy [and] training[.]"

### *Failed*

349.   A lot of people failed Nicolas Chavez.  The system failed him.  The community in which he was raised failed him.  And five Officers of the Houston Police Department failed him when they shot him 24 times while he was on his knees.  But most of all, the City of Houston failed him.  It failed him because it trained the Officers, through its official policy, to kill him.  They did just that.



# V.
# CAUSE OF ACTION

### *42 U.S.C. § 1983*
### *The City of Houston's unconstitutional policy*

350.   Plaintiff hereby incorporates by reference all facts are pleaded herein.

351.   Plaintiff brings suit against Defendant for violation of the Enforcement Act of 1871.  42 U.S.C. § 1983.  Specifically, Plaintiff brings suit against Defendant City of Houston, a municipality, for its own, non-vicarious liability under Section 1983.  *See Monell v. Dept. of Soc. Servs.*, 436 U.S. 658 (1978).

352.   The City of Houston had a policy, taught by policymakers at the Houston Police Academy and promulgated by policymakers up to and including Chief Acevedo, which taught Officers to shoot to kill citizens who picked up Tasers, without specifically differentiating as to whether or not the Tasers were spent (used) or live (unused).

353.   This policy, while not written, was taught in the academy and by instructors and constituted an official, formal policy of the City of Houston's Houston Police Department.

354.   Dr. Brooks, who taught this policy, avers to the same.

355.   This policy is facially unconstitutional.

356.   It is an overbroad violation of the Fourth Amendment to the United States Constitution, incorporated against the City of Houston by the Fourteenth

Amendment to the United States Constitution, to shoot dead a functionally unarmed person such as Nicolas. *See*, *e.g.*, *Roque v. Harvel*, 993 F.3d 325 (5th Cir. 2021) (*citing Tennessee v. Garner*, 471 U.S. 1 (1985)).

357.   The Fourth Amendment was well-known to all Officers and to all policymakers at the City, and was a clearly-established constitutional right.

358.   This unconstitutional violation is precisely what this policy not only allowed, but impelled.

359.   This policy was promulgated by policymakers up to and including Chief Acevedo.

360.   The policy was the moving force behind the unconstitutional violation.

361.   The unconstitutional violation was Nicolas's gratuitous shooting and death, for holding a spent Taser while on his knees.

362.   The City of Houston had a policy to shoot people like Nicolas who posed no harm.

363.   But for the policy, and proximately because of the policy, the Officers shot and killed Nicolas.

364.   The Officers say this.

365.   Officer Alvarado said this.

366.   Sergeant LeBlanc said this.

367.   Officer Rubio said this.

368.   Officer Tapia said this.

369.   Gamaldi said this.

370.   Griffith said this.

371.   Dr. Brooks said this.

372.   Everyone agreed, except for Chief Acevedo, who engaged in a cover-up.

373.   As a result, Nicolas lost his life, and the Plaintiff—vying to represent his Estate—suffered tremendous damages.

## VI.
## DAMAGES

374.   Plaintiff hereby fully incorporate the preceding paragraph by reference as if fully stated herein.

375.   As a result of the occurrence that forms the basis of this lawsuit, as stated above, and as a direct and proximate result of Defendant's wrongful and unconstitutional acts, the Estate of Nicolas Chavez, Deceased, suffered serious injuries and death, will likely sustain additional serious damages in the future, and is entitled to recover:

a.    mental anguish;

b.    physical pain;

c.    physical suffering;

d.    mental or emotional pain or anguish;

e.  loss of consortium;

f.  disfigurement;

g.  physical impairment;

h.  loss of companionship;

i.  loss of society;

j.  inconvenience;

k.  loss of enjoyment of life;

l.  injury to reputation;

m.  all other nonpecuniary damages as may be supplemented; past medical bills and expenses incurred as a proximate result of the occurrence made the basis of this suit;

n.  loss of income and wages;

o.  loss of earning potential;

p.  loss of household services;

q.  all other pecuniary damages as may be supplemented;

r.  exemplary damages;

s.  costs of court;

t.  expert fees;

u.  necessary and reasonable attorney's fees;

v.  pre-judgment interest;

w.  post-judgment interest; and

x.    all other miscellaneous damages as may be supplemented.

## VII.
## EXEMPLARY DAMAGES

376.   Plaintiff hereby fully incorporate the preceding paragraph by reference as if fully stated herein.

377.   Plaintiff would further show that the above-described acts and omissions of Defendants were committed with reckless and callous indifference to the federally protected rights of others, namely Plaintiffs, and was motivated by an evil intent.   Thus, Plaintiff pleads to the fullest extent allowable under 42 U.S.C. § 1983 their right to recover exemplary and punitive damages.

## VIII.
## EXPERT FEES

378.   Plaintiff hereby fully incorporate the preceding paragraph by reference as if fully stated herein.

379.   Plaintiff is further entitled to receive expert fees, pursuant to 42 U.S.C. § 1988.

## IX.
## ATTORNEY'S FEES

380.   Plaintiff hereby fully incorporate the preceding paragraph by reference as if fully stated herein.

381.   Plaintiff is further entitled to receive reasonable and necessary attorney's fees, pursuant to 42 U.S.C. § 1988.

## X.
## JURY DEMAND

382.   Plaintiff hereby demands a trial by jury and the appropriate fees have

been tendered.

## XI.
## DOCUMENTS ADOPTED BY REFERENCE

383.   Plaintiff adopts by reference the following Exhibits as documents

adopted by pursuant, pursuant to Rule 10(c) of the Federal Rules of Civil Procedure:

> a.   Body Camera Footage, Link to YouTube clip attached as
>       Exhibit "A." *See* D.E. 12-1.
>
> b.   Letter Suspending Sergeant LeBlanc, attached as Exhibit
>       "B." *See* D.E. 12-2.
>
> c.   Letter Suspending Officer Alvarado, attached as Exhibit
>       "C." *See* D.E. 12-3.
>
> d.   Letter Suspending Officer Rubio, attached as Exhibit "D."
>       *See* D.E. 12-4.
>
> e.   Letter Suspending Officer Tapia, attached as Exhibit "E."
>       *See* D.E. 12-5.
>
> f.   ~~Previous Incident involving Adrian Medearis, attached as~~
>       ~~Exhibit "F."~~

g. ~~Previous Incident involving Brian Clanch, attached as Exhibit "G."~~

h. Declaration of Dr. James R. Brooks, attached as Exhibit "H."

i. Resume of Dr. James R. Brooks, attached as Exhibit "I."

j. Officer Alvarado interview with Internal Affairs Division, attached as Exhibit "J."

k. Sergeant LeBlanc interview with Internal Affairs Division, attached as Exhibit "K."

l. Officer Rubio interview with Internal Affairs Division, attached as Exhibit "L."

m. Officer Tapia interview with Internal Affairs Division, attached as Exhibit "M."

n. New Taser Policy, June 29, 2020, attached as Exhibit "N."

o. Gamaldi Statement on April 30, 2020, attached as Exhibit "O."

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiff respectfully prays that Defendant answers the allegations herein, and upon trial thereof, Plaintiff has and recovers judgment against Defendant for all damages and injuries suffered and

incurred, for pre-judgment interest, for interest on the judgment, for court costs, and for all other such relief, both in law and in equity, to which the Honorable Court establishes Plaintiff is entitled.

Respectfully submitted,

**ROBERTS MARKLAND LLP**

By:    */s/ Sean A. Roberts*
       Sean A. Roberts
       Texas Bar No. 00797328
       Fed. Bar ID No. 21877
       Clive Markland
       Texas Bar No. 24027475
       Fed. Bar ID No. 585658
       Johnny P. Papantonakis
       Texas Bar No. 24032927
       Fed. Bar ID No. 30065
       Rob O. Cantu
       Texas Bar No. 24094580
       Fed. Bar ID No. 3180919
       Noah M. Horwitz
       Texas Bar No. 24116537
       Fed. Bar ID No. 3514879
       2555 N. MacGregor Way
       Houston, Texas 77004
       Telephone (713) 630-0900
       Facsimile (713) 630-0991
       Email: sr@robertsmarkland.com
       Email: cm@robertsmarkland.com
       Email: jp@robertsmarkland.com
       Email: rc@robertsmarkland.com
       Email: nh@robertsmarkland.com
       Email:eservice@robertsmarkland.com

(next page)

-and-

**THE LAW OFFICES OF WILVIN J. CARTER, P.C.**

Wilvin J. Carter
Texas Bar No. 24045622
Fed. Bar ID No. 568892
7322 Southwest Freeway, Suite 780
Houston, Texas 77074
Telephone: (713) 454-9890
Facsimile: (855) 380-3795
Email: carterlawpc@gmail.com

**ATTORNEYS FOR PLAINTIFF**

## DESIGNATED E-SERVICE EMAIL ADDRESS

The following is the designation of electronic service email address for the above attorney(s) for all electronically served documents and notices: eservice@robertsmarkland.com.

## **CERTIFICATE OF SERVICE**

Pursuant to Rule 5(b) of the Federal Rules of Civil Procedure, and further pursuant to Local Rule 5.3 of the Local Rules of the United States District Court for the Southern District of Texas, I hereby certify that a true and correct copy of the foregoing document has been forwarded to all counsel of record via the Court's electronic filing system on the 13th day of August, 2021.

*/s/ Sean A. Roberts*
Sean A. Roberts